Scott E. Ortiz WSB #5-2550
Erica R. Day WSB # 7-5261
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400 (82601)
P. O. Box 10700
Casper, WY 82602
307-265-0700 telephone
307-266-2306 facsimile
eday@wpdn.net
sortiz@wpdn.net

*Attorneys for Plaintiffs*

**FILED**



*4:41 pm, 1/8/24*

**Margaret Botkins
Clerk of Court**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **FOUR B PROPERTIES, LLC,** and **RANCH 10, LLC,** Plaintiffs, v. **THE NATURE CONSERVANCY,** a District of Columbia 501(c)(3) corporation, Defendant. | Civil Action No. 24-CV-00006 JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Four B Properties, LLC and Ranch 10, LLC ("Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint against Defendant, The Nature Conservancy ("TNC" or "Defendant"). In further support, Plaintiffs state as follows:

### NATURE OF THE ACTION

1. This case arises from TNC's senseless position that Plaintiffs cannot have more than one structure containing a kitchen on either of two 100-acre land parcels that they own in Teton County,

1

Wyoming – Ranch 9 and Ranch 10. This position has no conservationist purpose, runs contrary to the intentions of the land donor who wanted her land to be used as a working ranch, and is an about-face from TNC's two prior promises that Plaintiffs relied on to their detriment. Specifically, TNC's reversal of its prior commitments has prevented Plaintiffs from operating a working ranch on this property for the past seven years and has cost Plaintiffs millions of dollars.

2.     To support this pointless "one kitchen" proposition, TNC feigns devotion to a conservation easement imposed by land donor Gladys Moulton on former ranching land in Teton County, Wyoming, that she donated to TNC in 1995 (the "Conservation Easement").

3.     However, TNC has manipulated the Conservation Easement for years for its own substantial monetary benefit while ignoring conservationist principles.

4.     TNC's inconsistent and self-serving interpretations of the Conservation Easement contributed to seven years of needless litigation with Plaintiffs that has failed to advance conservationist principles, has flouted the intentions of the land donor, and has wasted millions of dollars.

5.     This action seeks to recover monetary damages for the substantial economic harm Plaintiffs have suffered due to TNC's now-retracted representations and promises both before the purchase of Ranch 10 and after the prior litigation that TNC invited.

## THE PARTIES, JURISDICTION, AND VENUE

6.     Four B Properties, LLC is a Delaware limited liability company with its principal place of business in Teton County, Wyoming. It is in good standing and authorized to do business in the State of Wyoming.

7.     Gary Binning, a Wyoming resident, is the only member of Four B Properties, LLC.

2

8. Ranch 10, LLC is a Wyoming limited liability company with its principal place of business in Teton County, Wyoming. It is in good standing and authorized to do business in the State of Wyoming.

9. Gary Binning, a Wyoming resident, is the only member of Ranch 10, LLC.

10. Defendant TNC is a non-profit corporation organized under Section 501(c)(3) of the Internal Revenue Code. TNC is incorporated in the District of Colombia and headquartered in Arlington, Virginia.

11. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship, and the amount in controversy exceeds seventy-five thousand dollars.

12. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF THE FACTS

### a. The Property and Conservation Easement

13. In 1905, the Gladys Moulton family homesteaded a 500-acre ranch on the Snake River floodplain.

14. In December 1995, Gladys Moulton, acting as trustee of the Gladys Moulton Trust u/t/a dated as of October 6, 1995 (the "Moulton Trust"), executed and delivered to TNC a Warranty Deed, which initially conveyed two lots of approximately one acre each to TNC.

15. The Warranty Deed also imposed the Conservation Easement "in perpetuity" on all 500 acres of land Ms. Moulton later donated to TNC (the "Moulton Property").

16. The Conservation Easement seeks to ensure the preservation and protection of the property's natural habitat and to allow the land to be used for ranching. Section 1 of the Conservation Easement provides:

> It is the purpose of this Conservation Easement to preserve and protect in perpetuity and to enhance and restore the significant relatively natural habitat and natural ecosystems of Grantor's Land. Specifically, and without limitation of the general purposes, it is the purpose hereof to preserve, protect, and enhance upon mutual agreement, the natural habitats, including the riparian areas and cottonwood communities on Grantor's Land. In so doing, it is the purpose of this Conservation Easement to permit the continuation on Grantor's Land of such ranching, residential and recreational uses as are consistent with the conservation purposes of this Conservation Easement.

17. Section E of the Conservation Easement allowed TNC to "construct, maintain, and replace no more than four (4) single family residential buildings (including the existing building) within the Building Area described in the Map" attached as Exhibit C to the Conservation Easement. The Conservation Easement further provided that the only permitted subdivision of Ms. Moulton's land was the "subdivision of up to four parcels **within the Building Area**." (emphasis supplied)

18. The Conservation Easement authorizes uses and practices for owners of property subject to the Conservation Easement, which include pasturizing and grazing domestic livestock; building, maintaining, and repairing fencing related to ranching; and guest ranching activities.

19. Following Gladys Moulton's death on February 16, 2000, TNC received the remaining entirety of the approximate 500 acres of the Moulton Property.

20. On or about March 29, 2004, after Ms. Moulton's death, TNC and the successor trustee to the Moulton Trust executed and filed the First Amendment to Warranty Deed and Conservation Easement (the "2004 Amendment") with the Teton County Clerk's Office.

21. The 2004 Amendment *eliminated* Ms. Moulton's original requirement that building on the land she donated to TNC occur only in one location.

22. Specifically, the 2004 Amendment stated: "the amendment seeks to further define the four (4) building envelopes, all of which were located in the River Bottom (also referred to as the Lower Bench Property) so that one (1) shall become the Moulton Family Building Envelope; one (1)

Building Envelope shall be moved to the Upper Bench Property, and two (2) Building Envelopes shall remain in the Lower Bench Property."

23. The 2004 Amendment radically altered Ms. Moulton's wish to restrict building to one defined area and instead allowed the land to be subdivided into four separate parcels, each of which had building rights.

24. The 2004 Amendment allowed TNC to sell off the Moulton Property in four parcels—the Lower Bench Parcel ("Ranch 9"), the Moulton Parcel, the Upper Bench Parcel, and the Remainder Parcel ("Ranch 10"), thus dramatically increasing the amount of money TNC could receive upon the sale of the land while obliterating Ms. Moulton's clear, written wishes.

25. TNC profited handsomely and quickly from its repudiation of Ms. Moulton's wishes. In August 2004, TNC offered for sale three building sites consisting of 452 acres of the Moulton Property through Sotheby's International Realty.

26. TNC sold the Lower Bench Parcel and the Remainder Parcel (Ranch 9 and Ranch 10) for $19.9 million to Mercer Reynolds in February 2005 and the Upper Bench Parcel to a Bernie Evans SPV for approximately $6.5 million in March 2005. TNC made $26.4 million by disregarding Ms. Moulton's clear, written intentions.

27. In December 2012, Plaintiff Four B Properties, LLC acquired Ranch 9 by Special Warranty Deed for $7.4 million.

28. On May 12, 2017, Plaintiff Ranch 10, LLC acquired a 50% interest in Ranch 10 by Warranty Deed in exchange for $6.5 million. Ranch 10, LLC purchased the remaining 50% interest in Ranch 10 for approximately $6.9 million in October 2018.

      b.    The Mercer Purchase and Sale Agreement

29. The entire dispute between Plaintiffs and TNC could have been avoided if, when Mr. Binning specifically inquired of TNC about building rights on Ranch 9 and Ranch 10, TNC had

disclosed to Mr. Binning that TNC had already agreed that Mercer Reynolds, the previous owner of Ranch 9 and Ranch 10, had the right to build a 3,000 square foot guest house on each of Ranch 9 and Ranch 10 and that Mr. Binning succeeded to those rights.

30. Mercer Reynolds purchased Ranches 9 and 10 for $19.9 million from TNC on February 3, 2005, pursuant to an Agreement for the Purchase and Sale of Real Estate (Purchase and Sale Agreement).

31. On July 27, 2005, Mr. Reynolds and TNC entered into the Third Amendment to the February 3, 2005 Purchase and Sale Agreement (the February 3, 2005 Purchase and Sale Agreement and all Amendments thereto, the "Mercer PSA").

32. The Third Amendment contained a section, "Clarification regarding Conservation Easements," under which TNC confirmed to Mr. Reynolds that TNC "construes the Conservation easement to permit one (1) guest house not exceeding a total of three thousand (3000) square feet in each building envelope as an 'associated improvement'...."

33. Section 16 of the Mercer PSA provides that the terms and conditions of the agreement "shall apply to and bind the heirs, executors, administrators, successors, and assigns of the respective parties."

34. Despite the fact that TNC was party to the Mercer PSA, when Mr. Binning approached TNC to ask about permissible building on Ranch 9 and Ranch 10, TNC failed to disclose to Mr. Binning that he had the right to build a 3,000 square foot guest house on each of Ranch 9 and Ranch 10. It was not until February 6, 2018 that TNC finally produced the Mercer PSA in litigation discovery, that Mr. Binning learned he always had this right.

35. In its eventual ruling on the dispute between TNC and Mr. Binning, the Wyoming Supreme Court stated that the Mercer PSA was "relevant to this case" because:

> [TNC] agreed to a meaning of 'associated improvements' that would allow the construction of a guest house on each of Mr. Reynolds' parcels. The Third Amendment to the Agreement for the Purchase and Sale of Real Estate between Mr. Reynolds and [TNC] attempted to clarify, but did not amend the Conservation Easement. It stated as follows: '... **Further [TNC] hereby confirms to the Buyer that [TNC] construes the Conservation easements to permit one (1) guest house not exceeding three thousand (3,000) square feet in each building envelope as an 'associated improvement.'** As such term is used on pages 2 and 3 of the First Amendment, provided Buyer obtains authorization under Teton County Land Development Regulations...to build a structure of such size. Nothing herein shall be deemed to be an amendment of the Conservation easements.

*Four B Properties, LLC v. The Nature Conservancy*, 458 P.3d 832, 837 (Wyo. 2020) (emphasis supplied by the Court).

      **c.**    **TNC's Inconsistent, Self-Serving Interpretations of the Conservation Easement**

36. Before Mr. Binning purchased Ranch 9 in December of 2012, he was aware of and relied upon TNC's longstanding pattern and practice of allowing 2,500 square foot guest houses on land parcels subject to the Conservation Easement.

37. TNC took the position as early as 2006 that it was permissible for owners of property subject to the Conservation Easement to build 2,500 square foot guest houses on their property.

38. In response to an inquiry about the structures allowed on a 10-acre building envelope within the Upper Bench Parcel that was subject to the Conservation Easement. TNC "Land Conservation Specialist" Randy Craft wrote a September 6, 2006 email to land owner Bernie Evans. TNC wrote; "In conversations with your representatives and TNC employees and keeping with the customs of Teton County at this time, we agreed that one guest house not to exceed 2,500 square feet would be considered an associated improvement" and thus permitted by the Conservation Easement.

39. Ultimately, TNC allowed Mr. Evans to build a single-family residential structure, a guesthouse, AND a caretaker's quarters.

40. In addition, in 2012, TNC approved a building plan for the Upper Bench and Remainder parcels subject to the Conservation Easement that allowed two kitchens on each land parcel.

41. On November 5, 2012, Andrea Erickson Quiroz, Wyoming State Director of TNC, wrote to Doug MacKenzie of Palo Alto, California, about Mr. MacKenzie's building plans for the Upper Benchand Remainder Parcels. Mr. Quiroz wrote: TNC is comfortable with up to two kitchens on each of the building envelopes – one for the single-family residential structure and one for the guest house (or accessory residential unit by current Teton county regs)."

42. On September 3, 2015, Edyn Jessup of TNC wrote an email to Michele Dillard regarding building plans on Ranch 10. Ms. Jessup stated that, consistent with the Conservation Easement, TNC could approve one residence and a small guest house of approximately 2,500 square feet.

43. On May 4, 2016, Acting State Director of TNC, Paula Hunker wrote to Michele Dillard about permitted building on Ranch 10. TNC wrote:

> In interpreting what 'associated improvements' might be allowed in conjunction with a single-family residence, in the past, TNC has considered, solely as a point of reference and by no means as a binding determination, the Teton County land development regulations relating to a 'standard single family residence' in the community.  Although a guest house is not specifically identified in the [Conservation] Easement as a permitted "associated improvement," TNC has previously approved construction of a guest house restricted in size to 2,500 square feet on another portion of the Moulton property known as the Upper Bench Parcel which is also encumbered by the [Conservation] Easement.
>
> Given the clear language of the [Conservation] Easement intending to restrict the overall number of full time residences on the Property, coupled with past TNC decisions, TNC believes the [Conservation] Easement restricts development to one single family residential dwelling, one 2,500 square foot guest house, and other associated improvements as specifically set forth in the [Conservation] Easement's definition of 'associated improvements.' [TNC] believes this determination ensures consistency with previous decisions and with its understanding of Gladys Moulton's intentions as evidenced by the [Conservation] Easement language.

44. The Wyoming Supreme Court made it clear that while TNC had interpreted the Conservation Easement in an inconsistent fashion, TNC had discretion to interpret and apply the Conservation Easement. The Wyoming Supreme Court stated:

> The Conservation Easement grants [TNC] discretion in its interpretation and application of the Conservation Easement terms. Section 7(J) of the Conservation Easement specifies, "Enforcement of the terms and provisions of the Conservation Easement shall be at the discretion of [TNC]."

*Four B Properties,* 458 P.2d at 844-845.

### d.   Representations TNC Made to Mr. Binning in Advance of his Purchase of Ranch 10

45. Mr. Binning asked TNC about building restrictions on Ranch 9 and Ranch 10 in August 2016.

46. TNC initially told Mr. Binning that he could build 2,500 square foot guest houses on both Ranch 9 and Ranch 10 but did not disclose that under the Mercer PSA, Mr. Binning actually had the right to build 3,000 square foot guest houses on both Ranch 9 and Ranch 10. TNC also refused to provide Mr. Binning TNC's rationale for its arbitrary size restriction, and ultimately invited Mr. Binning to litigate the issue.

47. Specifically, on August 29, 2016, in response to an inquiry Mr. Binning made of TNC, TNC "Land Strategies Director," Jim Luchsinger, emailed Mr. Binning that he worked with Greer Freed, also of TNC, and understood from Ms. Freed that Mr. Binning wanted to confirm the details and building restrictions on Ranch 9. Mr. Luchsinger asked that Mr. Binning send his questions.

48. On August 30, 2016, Mr. Binning emailed Mr. Luchsinger, copying Ms. Freed, stating that he owns Ranch 9 and is thinking of buying Ranch 10. Mr. Binning inquired of TNC whether associated improvements in the Conservation Easement would include a guest house.

49. Mr. Binning further stated in the August 30, 2016 email that one of the reasons he was considering purchasing Ranch 10 from the Dillards was "to ensure that the property is adequately conserved" because of concern "about the motives of other potential purchasers."

50. Mr. Binning is a lifelong conservationist and has, in the past, donated to TNC. He has already spent approximately $2 million on Ranches 9 and 10 to uphold the conservationist principles to which TNC pays mere lip service. Specifically, the Wyoming Supreme Court stated:

> Since purchasing the Lower Bench Parcel (Ranch 9) and the Remainder Parcel (Ranch 10), Mr. Binning has accomplished extensive, and expensive, conservation work. At the cost of about $2 million, Mr. Binning planted and irrigated 'hundreds' of cottonwood and spruce trees, and he excavated three ponds on Ranch 9 and a couple of ponds on Ranch 10. He used the gravel tailings from the excavation of the ponds to build roads on his properties. In the newly constructed ponds and streams, he introduced native cutthroat trout stock.

*Four B Properties.*, 458 P. 3d at 839.

51. On September 9, 2016, Mr. Luchsinger responded to Mr. Binning. Mr. Luchsinger represented to Mr. Binning that he would be able to build a 2,500 square foot guest house on each of Ranches 9 and 10.

52. TNC made no response to the conservationist concerns Mr. Binning raised regarding Ranch 10.

53. On September 12, 2016, Mr. Luchsinger sent a further email to Mr. Binning stating that TNC's current and past interpretations of the Conservation Easement allowed 2,500 square foot guest houses on both Ranch 9 and Ranch 10. Mr. Luchsinger wrote:

> The Conservancy interprets a 'single family residential structure' to mean a residence designed for a single family, as opposed to for multiple families. In interpreting what 'associated improvements' might be allowed in conjunction with a single family residence, in the past, TNC has considered, solely as a point of reference and by no means as a binding determination, the Teton County LDRs relating to a 'standard single family residence' in the community. Although a guest house is not specifically identified in the Easement as a permitted 'associated improvement,' TNC has previously approved construction of a guest house restricted in size to 2,500 square

feet on another portion of the Moulton property known as the Upper Bench Parcel which is also encumbered by the Easement.

> Given the clear language of the Easement intending to restrict the overall number of full-time residences on the Property, coupled with past TNC decisions, the [Conservation] Easement restricts development on each of Ranch 9 and Ranch 10 to one single family residential dwelling, one 2,500 square foot guest house, and other associated improvements as specifically set forth in the Easement's definition of 'associated improvements.' Furthermore, TNC's definition of a barn is a structure that is used to house livestock, livestock feed, and agricultural equipment, but is not inhabited by humans. This determination is consistent with previous decisions and with Gladys Moulton's intentions as evidenced by Easement language.

54. On September 20, 2016, Mr. Binning sent a further letter to Mr. Luchsinger in response to his September email in which he proposed restricting his existing building and land development rights on Ranches 9 and 10 in exchange for being allowed to build larger guest houses consistent with the Teton County Land Development Regulations ("LDRs"). Mr. Binning proposed:

> [W]e would be willing to restrict some of the Ranch 9 development rights to add to the conservation value of the property. Currently the Teton County LDRs allow under a Floor Area PRD for a R-1 property with 103 acres such as Ranch 9, over 220,000 square feet of site development which is defined as the area of the property/site covered by buildings, structures, impervious surfaces, porches, decks, terraces, patios, driveways, walkways, parking areas and regularly disturbed areas such as corrals, outdoor storage, and stockpiles. In order to provide an increase in conservation value, we would be willing to either reduce our right to site development by 10% or 22,000 square feet or further grant an additional acre of building envelope to TNC as an increase in conserved values on Ranch 9, at our option, in exchange for acknowledgement, through an interpretive letter, for the permission to build guest houses/or other caretaker quarters in the size and number permitted under the Teton County LDRs. My family believes this is a special piece of property and share TNC's objectives in protecting and potentially increasing the conservation values of this property, while still allowing for reasonable development as contemplated by Gladys Moulton....

55. Mr. Binning's proposal to restrict building rights on the land in exchange for the ability to build a caretaker's quarters was based on his desire to operate Ranch 9 and Ranch 10 as a working ranch as land donor Ms. Moulton intended and it was for that reason that he sought building concessions beyond TNC's promise that he could build 2,500 square foot guest houses on Ranch 9 and Ranch 10.

56. Mr. Luchsinger ignored Mr. Binning's wish to reach an accommodation and disregarded the conservation rationale behind Mr. Binning's proposal that he voluntarily reduce his building rights. Instead, Mr. Luchsinger left Mr. Binning a voicemail that TNC's position was that Mr. Binning could only build a 2,500 square foot guest house or caretaker's quarters on each of Ranch 9 and Ranch 10.

57. Regarding the size restriction, Mr. Luchsinger stated only that this was what TNC was "comfortable with" and added the personal note that his own home "is not 2,500 square feet."

58. On September 30, 2016, Mr. Binning sent a letter to Ms. Freed and Lisa Price of TNC, explaining to them his correspondence with Mr. Luchsinger and that he and Mr. Luchsinger had reached an impasse in their discussions.

59. Despite numerous attempts by Mr. Binning to obtain a reasoned basis for TNC's 2,500 square foot guest house restriction, TNC management and employees refused to meet with Mr. Binning or to discuss the issue.

60. TNC representatives told Mr. Binning to "take it or leave it" regarding TNC's representation to Mr. Binning that he was able to build one 2,500 square foot guest houses on each of Ranch 9 and Ranch 10.

61. Neither did any TNC employee provide a single conservation or habitat-related explanation for the guest house size restriction, explain how and why the restriction honored the wishes of Ms. Gladys Moulton, the original donor, or identify where the restriction appeared in the Conservation Easement.

62. At no time during TNC's interactions with Mr. Binning did anyone from TNC disclose to Mr. Binning that the Mercer PSA, to which TNC was party and which was in TNC's possession, allowed Mr. Binning to build 3,000 square foot guest houses on each of Ranch 9 and Ranch 10.

63. In or about October 2016, Mr. Luchsinger suggested to Mr. Binning that if they were unable to agree on the guest house issue, that Mr. Binning should appeal to the Wyoming courts for interpretive assistance on permissible building pursuant to the Conservation Easement.

64. On May 12, 2017, in reliance on TNC's representations to Mr. Binning that he could build a 2,500 square foot guest house on Ranch 10, and in advance of any litigation with TNC on the topic, Ranch 10, LLC acquired a 50% interest in Ranch 10 by Warranty Deed in exchange for $6,500,000. Ranch 10, LLC purchased the remaining 50% interest in Ranch 10 for approximately $6,900,000 in October 2018.

### e. Litigation in Connection with the Guest House Issue

65. As instructed by TNC, on June 10, 2017, Plaintiffs Four B Properties, LLC and Ranch 10, LLC initiated a complaint against TNC to ascertain the number and size of the guest houses permitted on Ranch 9 and Ranch 10 by the Conservation Easement.

66. TNC filed its answer and counterclaims on August 22, 2017. In its answer and counterclaims, TNC took the position, on information and belief for the first time in recorded history, and contrary to the Mercer PSA to which TNC was party and which was in TNC's possession as well as to TNC's prior representations and practices with respect to other land parcels subject to the Conservation Easement and to TNC's prior promises to Mr. Binning, that Mr. Binning could not build **any** guest house on either Ranch 9 or Ranch 10, irrespective of size.

67. TNC's position in the litigation revoked its prior representation that Mr. Binning could build 2,500 square foot guest houses on both Ranch 9 and Ranch 10. And TNC did so for no valid conservation reason and no reason based on donor intent.

68. Relying on a strict interpretation of "associated improvements" in the Conservation Easement, on July 20, 2018, the Wyoming District Court ruled that a guest house did not fall within

the definition of "associated improvements" and was not authorized by the Conservation Easement.

69. On March 27, 2019, Plaintiffs filed their Notice of Appeal of the Wyoming District Court rulings.

70. On March 13, 2020, the Wyoming Supreme Court issued an Order affirming the District Court's judgment.

71. The Wyoming Supreme Court specifically stated that TNC retained discretion under Section 7(j) of the Conservation Easement to authorize guest houses or other buildings.

72. TNC remained free to allow Mr. Binning to build 2,500 square foot guest houses on Ranch 9 and Ranch 10 as TNC specifically promised him in August 2016 and as owners of other land parcels subject to the Conservation Easement had done.

73. Notwithstanding that fact, TNC has consistently since 2020 taken the unsupported position that the Wyoming Supreme Court ruling prevents TNC from allowing Mr. Binning to build a guest house of any size on Ranch 9 or Ranch 10.

74. TNC is able to keep the promise TNC made to Mr. Binning in September 2016, that he could build 2,500 square foot guest houses on both Ranch 9 and Ranch 10 but chose not to do so starting when Mr. Binning commenced litigation at TNC's suggestion and continuing to this date.

   f. **Representations TNC Made to Mr. Binning Following the Wyoming Supreme Court Opinion.**

75. On August 24, 2020, after litigation had concluded, Mr. Binning met with Hayley Mortimer, the director of TNC, at the Teton Pines Country Club. Mr. Binning asked Ms. Mortimer what type of building TNC would be willing to accept.

76. Ms. Mortimer told Mr. Binning that TNC did not want to engage in any more litigation with Mr. Binning. Ms. Mortimer represented to Mr. Binning that TNC would approve Mr. Binning's

construction of a building that was not attached to Mr. Binning's primary residence so long as the building did not have a kitchen.

77. In reliance on Ms. Mortimer's statements to him on behalf of TNC, on May 8, 2020, Mr. Binning met with his architect, John Carney, and requested that Mr. Carney draw up building plans for the construction of an unattached kitchenless structure on Ranch 9, planned as a Wellness Center, to comply with TNC's representation as to the structure it would approve.

78. In reliance on Ms. Mortimer's statements to him on behalf of TNC, Mr. Binning paid Mr. Carney's architectural firm, Prospect Studios, $829,285 for the architectural plans that included a Wellness Center to be constructed on Ranch 9.

79. Also in reliance on Ms. Mortimer's statements to him on behalf of TNC, on August 18, 2022, Mr. Binning applied for permits for a building plan that included construction of the Wellness Center on Ranch 9 and paid $184,749.90 for the permits.

80. In October 2022, Mr. Binning submitted his architect's plans for the Wellness Center to TNC despite the fact that there was no requirement that he do so.

81. In early November 2022, at Mr. Binning's request, Mr. Binning's architect, John Carney, met with TNC to show them the architectural plans for the proposed Wellness Center although there was no requirement that he do so.

82. Following this meeting, in November 2022, TNC revoked the approval Ms. Mortimer had provided that Mr. Binning could build a kitchenless structure that was not attached to the main residence. Instead, TNC took the position that the proposed Wellness Center "looks too much like a guest house" even though the plans included no kitchen and no closets.

83. On February 2, 2023, Edyn Jessup, TNC "Protection Director," sent a letter to Mr. Binning reversing TNC's November 2022 position and stating that TNC refused to approve Mr. Binning's Wellness Center architectural plans. Ms. Jessup's letter set forth TNC's newly minted position that

TNC could approve Mr. Binning's architectural plans, but that Mr. Binning would have to record building restrictions on both Ranch 9 and Ranch 10 such that no one could construct a guest house on either property now, or at any time in the future.

84. Declining to obliterate millions of dollars of value from Ranch 9 and Ranch 10, Mr. Binning rejected TNC's demand.

85. After it became clear to Mr. Binning that there would be no agreement with TNC about his proposed plans for a Wellness Center, Mr. Binning sought and received a refund of $154,249.90 of the money he had advanced for building permits in reliance on the representations of TNC but lost the remaining $30,500.

86. In total, Plaintiff spent more than $859,785 on architectural and unrefunded permit expenses in reliance on TNC's representations.

## COUNT I

### Promissory Estoppel

87. Plaintiffs incorporate the above paragraphs by reference as if fully set forth herein.

88. On August 30, 2016, Mr. Binning informed TNC representative Jim Luchsinger that he was thinking of purchasing Ranch 10 and, in that context, asked Mr. Luchsinger to clarify TNC's position on the permissible size of guest houses on Ranch 9 and Ranch 10

89. Through Mr. Luchsinger, TNC made a clear and definite promise that TNC permitted a 2,500 square foot guest house on both Ranch 9 and Ranch 10. TNC made this promise in advance of May 12, 2017, when Ranch 10, LLC advanced $6,500,000 for the partial purchase of Ranch 10, which purchase was completed in October 2018 for an additional $6,900,000.

90. Mr. Binning reasonably relied on TNC's clear and definite promise that TNC permitted a 2,500 square foot guest house on both Ranch 9 and Ranch 10 in causing Ranch 10, LLC to purchase Ranch 10.

91. Under these circumstances, TNC knew or should have known that its representations would induce Mr. Binning and/or Ranch 10, LLC to rely and expend funds on purchasing Ranch 10.

92. Injustice can be avoided only if TNC is required to compensate Ranch 10, LLC for the funds it expended to purchase Ranch 10.

## COUNT II

### Promissory Estoppel

93. Plaintiffs incorporate the above paragraphs by reference as if fully set forth herein.

94. On August 21, 2020, Mr. Binning met with Hayley Mortimer of TNC and Ms. Mortimer informed him that TNC did not object to his building an unattached, kitchenless structure next to his primary residence and that TNC approved this structure.

95. Through Ms. Mortimer, TNC made a clear and definite promise that TNC would permit Mr. Binning to build the unattached kitchenless structure that Mr. Binning termed a "Wellness Center" in advance of Mr. Binning advancing $829,285 for architectural plans and $30,500 for building permits for the Wellness Center that he was unable to recover.

96. Mr. Binning reasonably relied on TNC's clear and definite promise that TNC would permit Mr. Binning to build an unattached kitchenless structure on Ranch 9.

97. Under these circumstances, TNC knew or should have known that its representations would induce Mr. Binning to expend funds on architectural plans and building permits for the Wellness Center.

98. Injustice can be avoided only if TNC is required to compensate Mr. Binning for the funds he expended for architectural plans and the unrefunded funds expended on building permits.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for the entry of judgment by the Court:

    (i)    finding Defendant liable and awarding damages in an amount to be determined at trial;

(ii)   awarding pre- and post-judgment interest; and

(iii)  granting such other and further relief as this Court may deem just and proper, including attorneys' fees and costs.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

**DATED** this 8th day of January, 2024.

        **FOUR B PROPERTIES, LLC and RANCH 10, LLC**

        /s/ Erica R. Day
        Scott E. Ortiz WSB #5-2550
        Erica R. Day WSB # 7-5261
        Williams, Porter, Day & Neville, P.C.
        159 North Wolcott, Suite 400 (82601)
        P. O. Box 10700
        Casper, WY 82602
        307-265-0700 telephone
        307-266-2306 facsimile
        sortiz@wpdn.net
        eday@wpdn.net